UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 18-414 |
| PHILLIP GUIDRY | SECTION M (1) |

## **ORDER & REASONS**

Before the Court is a motion to suppress filed by the defendant Phillip Guidry ("Guidry") seeking to exclude any evidence seized in Guidry's home on March 2, 2018, and any statements made thereafter on the ground that the search violated the Fourth Amendment.[1] The government opposes the motion,[2] and Guidry submitted a reply in support.[3] On December 13, 2018, the Court held an evidentiary hearing. At the hearing, the government presented the testimony of Homeland Security Agent Thomas Smith ("Smith"), who was directly involved with the defendant's arrest and the search of the defendant's residence, and Officer Jeffrey Carrol Holley ("Holley"), who obtained completed consent-to-search and waiver-of-rights forms from the defendant's wife, Kaycee Guidry ("Ms. Guidry"). The defendant presented the testimony of Ms. Guidry. The government also presented audio of the recorded initial encounter between law enforcement officers and Ms. Guidry, and the defendant submitted a transcript of the recording. Having considered the parties' memoranda, the testimony and other evidence elicited at the hearing, and the applicable law, the Court issues this Order & Reasons.

---

[1] R. Doc. 15.
[2] R. Doc. 27.
[3] R. Doc. 31.

1

## I. BACKGROUND

On March 2, 2018, state and local police arrested Guidry pursuant to an out-of-state arrest warrant for a felony firearms violation. Smith testified that, prior to the arrest, he had investigated Guidry for being a self-professed "sovereign citizen." In Smith's twenty-four years of law enforcement experience, he knew that sovereign citizens, or "preppers," typically stockpile weapons to prepare for doomsday survival. Smith testified that members of the community had made comments that Guidry's home was fitted with sniper holes, and that Guidry had bragged about having guns. Smith also testified that he had conducted surveillance of the home and observed that it was fortified with industrial fences, dogs, and metal fortifications.[4] Although the law enforcement officers lacked a search warrant, Agent Smith testified he had probable cause to support a warrant to search the home for firearms.

Shortly after Guidry's arrest, Agent Smith and Task Force Officer Victor Marler of Homeland Security then approached Guidry's wife, also a convicted felon, at her place of employment to obtain consent to search the home. As evidenced in the eight-minute recording of the encounter, Ms. Guidry admitted she was "kind of" expecting the officers upon their entry.[5] After informing Ms. Guidry that her husband was "under arrest for some weapons charges," Officer Marler said that they needed to get into the home and did not "want to harm no dogs."[6] Ms. Guidry immediately explained that she had two Malinois dogs that were "kind of aggressive," one husky, and eight Malinois puppies.[7] Before Ms. Guidry began to describe the location of her son's gun, Marler reminded Ms. Guidry that she was "a convicted felon as well," but that the

---

[4] The metal fortifications appear to be storm shutters that resemble security doors for mall vendors, according to Officer Holley.
[5] Gov't Ex. A; Defendant Ex. D-1 A at 1.
[6] Defendant Ex. D-1 A at 2.
[7] *Id.*

2

officers were "not interested in y'all."[8]  Then, Marler told Ms. Guidry: "We talked to him already and he would know what's in there. We just need the verification. … [W]e talked to him and he told us.  Prepping, he told us everything.  You know, um, and we told him we don't want to involve you because you still got work. … And you have a child to take care of."[9]  Following his arrest, Guidry had not told police anything about firearms at his home.  To the extent that Marler's words can be understood otherwise, Smith admitted at the hearing that it would have been a lie.  Returning to Ms. Guidry's encounter with Smith and Marler, Ms. Guidry then tearfully admitted that she had been separated from Guidry, sleeping in a separate bedroom in the house, and shortly thereafter described two more guns in the home.[10]

Marler then asked if Ms. Guidry would give her consent to search the home and accompany them to do so.[11]  Again, tearfully, Ms. Guidry responded, "Okay.  Are y'all going to take me in? If you are – I need to make arrangements for my daughter."[12]  Marler said he "can't promise you anything, but with your cooperation, we know the DAs, we know everybody."[13]  Smith responded that they would not "take her in" or trick her into doing something that would give them reason to arrest her, but that her cooperation was the "smoothest way to do it," avoiding "cut[ting] up your fence to get in," "us[ing] a battering ram and bash[ing] in your door to get inside," or "potentially shoot[ing] or hurt[ing] a dog on the way in."[14]

The group made plans to leave.  Ms. Guidry permitted the officers to use the restroom, called her boss to let him know she would not be returning to work, and gave her contact information to her coworker.  Ms. Guidry had initially agreed to ride with the police, but because

---

[8] *Id.* at 3-4.
[9] *Id.* at 4-5.
[10] *Id.* at 6-7.
[11] *Id.* at 8-9.
[12] *Id.* at 9.
[13] *Id.* at 10.
[14] *Id.* at 10, 12.

she could work from home, drove herself in her own car, and the police followed. The police officers had requested that Ms. Guidry put her purse in the trunk of her car for the ride over to her home, and she had complied without objection.

There is conflicting testimony as to when Ms. Guidry signed the consent-to-search and statement-of-rights forms. Officer Holley testified that, upon Ms. Guidry's arrival and in the driveway, he read her a consent form, which she and he signed at "1112 hrs" (11:12 a.m.), as denoted on the form.[15] Holley testified that Ms. Guidry was cordial and helpful, seemed to have her wits about her, and was less nervous than others in similar circumstances. Holley testified that Ms. Guidry then opened the gate, secured the dogs, entered the home, and directed the officers to the bedroom and the mattress under which an automatic weapon was hidden. The statement-of-rights form was completed later, also signed by Holley and Ms. Guidry, and shows the time it was completed as "1133 hrs" (11:33 a.m.). It bears a handwritten note that states, "Search begins 1120 hrs" (11:20 a.m.).[16] Thus, as Holley remembers it, Ms. Guidry showed the officers the gun in the bedroom shortly after signing the consent-to-search form but before executing the statement-of-rights form. Ms. Guidry testified that she does not remember signing anything until after showing the officers a gun in her husband's bedroom.

The officers seized six firearms on March 2, 2018.[17] On March 6, 2018, law enforcement again contacted Ms. Guidry to obtain consent to search the Guidry home. On March 7, 2018, Ms. Guidry permitted the second search, during which the Bureau of Alcohol, Tobacco, and Firearms seized ammunition and a surveillance DVR system.[18] No charges followed the second search.[19]

---

[15] Gov't Ex. D at Guidry00091.
[16] *Id.* at Guidry00090.
[17] R. Doc. 1.
[18] R. Doc. 27-2.
[19] *See id.;* R. Doc. 1.

4

Thereafter, the Grand Jury charged Guidry in a one-count indictment for being a convicted felon in possession of a firearm in violation of 28 U.S.C. §§ 922(g)(1) and 924(a)(2).[20]

## II. PENDING MOTION

Guidry moves to suppress the evidence seized on March 2, 2018, and any statements subsequently made by him or his wife on the ground that the warrantless search violated the Fourth Amendment.[21] Guidry contends that the officers, lacking probable cause, coerced Ms. Guidry into showing the officers the firearms in the home by making misrepresentations and threats. Guidry says the officers concocted Guidry's confession to possessing firearms when they informed Ms. Guidry he had "told [them] everything," because, at the time of his arrest and booking, Guidry had only made general remarks about his religious and political beliefs.[22] Further, because Ms. Guidry was a convicted felon, Guidry suggests she did not believe she could refuse consent, implying that her cooperation was forced by the threat of her own arrest. Guidry also essentially contends that the officers' comments about shooting the dogs and Ms. Guidry's need to care for her child constituted a "veiled threat" of arrest such that her will was overborne.[23] Additionally, Guidry argues that the officers never informed Ms. Guidry of her right to refuse consent or terminate the police encounter, which contributed to her reasonable fear as "a woman, confronted by two male law enforcement officers who announced they had just arrested her husband."[24] And finally, Guidry submits that the officers had ample time to obtain a warrant while Guidry was arrested and Ms. Guidry was at work and they should have done so.[25] Alternatively, Guidry contends that consent was never given prior to the search, suggesting that the time stated on the consent-to-

---

[20] R. Doc. 1.
[21] R. Doc. 15.
[22] R. Doc. 15-2 at 3.
[23] *Id.* at 4.
[24] *Id.*
[25] *Id.* at 5.

5

search form was fabricated, and that Ms. Guidry only signed the consent-to-search form after the police seized the firearms.[26] In either instance, Guidry maintains that the firearms and statements should be suppressed as fruits of the poisonous tree.

The government claims it has carried its burden to show that Ms. Guidry, as a person with authority, provided oral and written consent freely and voluntarily. First, the government contends that Ms. Guidry's oral consent was voluntary. Thus, the timing as to when Ms. Guidry gave written consent is superfluous.[27] Nonetheless, the government claims that no search began until Ms. Guidry signed the consent-to-search form. Moreover, says the government, probable cause existed to obtain a search warrant of the home, such that suppression is unjustified.[28]

In support of voluntariness, the government analyzes the six factors applied by the Fifth Circuit.[29] At no point was Ms. Guidry under arrest; the conversation was cordial rather than coercive; and Ms. Guidry showed a high level of cooperation by leading the officers to her home, securing the dogs, and revealing the locations of at least three guns. Further, there is no requirement that she be informed of her right to refuse consent; besides, her prior conviction shows her familiarity with the criminal justice system and awareness of her rights. There is no suggestion, posits the government, that Ms. Guidry is uneducated, is not fluent in English, or cannot read. And although Ms. Guidry knew incriminating evidence existed at her home, that factor is not dispositive. According to the government, the totality of the circumstances demonstrates that Ms. Guidry freely gave her consent, which is underscored by the fact that, five days after the initial search, she gave consent to search the home a second time, which the defendant does not challenge.

---

[26] *Id.*
[27] *See* R. Doc. 27 at 1, 4.
[28] *Id.* at 10-11.
[29] *Id.* at 6-10. *See infra* Section III at p. 7.

6

## III. LAW & ANALYSIS

Warrantless searches are presumptively unreasonable under the Fourth and Fourteenth Amendments, absent an exception, such as when conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The government bears the burden of proving consent by a preponderance of the evidence. *See United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). Consent is valid when it is given by a person with actual or apparent authority over the premises sought to be searched. *Illinois v. Rodriguez*, 497 U.S. 177, 186-89 (1990); *see also United States v. Matlock*, 415 U.S. 164, 171 & n.7 (1974) (consent given by third person is valid when third person possesses "common authority," that is, "mutual use of property by persons generally having joint access or control for most purposes").

After determining that a person with authority gave consent, the Court must determine whether consent was voluntary. To do so, courts in the Fifth Circuit consider six factors:

> (1) the voluntariness of the defendant's [or third party's] custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's [or third party's] cooperation with the police; (4) the defendant's [or third party's] awareness of his right to refuse consent; (5) the defendant's [or third party's] education and intelligence; and (6) the defendant's [or third party's] belief that no incriminating evidence will be found.

*United States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006); *see United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993) (applying factors to a third party). While all six factors are relevant, no one factor is dispositive. *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993). Instead, the Court examines every factor in the totality of the circumstances. The critical issue is whether the defendant or third party's will was overborne. *United States v. Davis*, 749 F.2d 292, 294 (5th Cir. 1985). Consent may not be "the product of duress or coercion, express or implied," or the mere "acquiescence to a claim of lawful authority." *United States v. Mendenhall*, 446 U.S. 544, 557 (1980) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968)). Rather, the

7

government "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper*, 391 U.S. at 548.

In this case, Guidry does not dispute that Ms. Guidry had authority to give consent to the search,[30] but principally argues that her consent was involuntary. Guidry contends that Ms. Guidry's will was overborne considering the totality of the circumstances, including the officers' alleged misrepresentations and threats. The totality of the circumstances, however, does not show that Ms. Guidry's will was overborne, but instead, demonstrates that Ms. Guidry's consent was, in fact, freely and voluntarily given.

When analyzing the first factor, courts generally consider whether a reasonable person would not feel free to leave, the lower standard associated with any seizure rather than the higher standard of custody, which is a degree of restraint associated with a formal arrest. *Compare Mendenhall*, 446 U.S. at 553-54 (defining seizure for purposes of the Fourth Amendment to mean "when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained"), *with Stansbury v. California*, 511 U.S. 318, 322-23 (1994) (defining custody for purposes of *Miranda* as "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest" (internal quotations omitted)). *See, e.g.*, *Shabazz*, 993 F.2d at 438.

Here, the officers approached Ms. Guidry at her place of work. Merely being questioned by law enforcement in one's place of work does not transform the encounter into a seizure. *I.N.S. v. Delgado*, 466 U.S. 210, 216, 221 (1984).

---

[30] The Court notes that the officers had a reasonable belief that Ms. Guidry, who resided in the same household with her husband, the defendant, albeit in separate bedrooms, had common authority over the premises to be searched. *See, e.g.*, *United States v. Shelton*, 337 F.3d 529, 536-38 (5th Cir. 2003) (estranged wife had common authority over home where husband had not taken steps to prevent her access to the home, and he shared information with her relating to his illegal activities). After all, Ms, Guidry testified that she had access to her husband's bedroom because her clothes were kept in a closet in that bedroom.

> Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would not have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the person refuses to answer and the police take additional steps … to obtain an answer, the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure.

*Id.* at 216. Although Ms. Guidry testified that her business was not open to the public, there is no evidence or suggestion that she was unable to end the conversation. And while Guidry posits that, as a woman in the face of two male police officers who had just been informed that her husband had been arrested, Ms. Guidry would not have felt free to leave, the Fifth Circuit has "held consent to be voluntary even in the face of greater shows of force than … seven officers, some in uniform and none with weapons drawn or displaying force beyond their presence in numbers." *United States v. Solis*, 299 F.3d 420, 438 (5th Cir. 2002). Smith testified that, though in uniform, neither he nor Marler drew their weapons. The agents' mere presence at Ms. Guidry's business did not cause her to be seized.

Guidry next argues that Ms. Guidry was not free to leave because her purse was placed in the trunk of her car prior to leaving her business. Law enforcement's retention of a person's identification for an unreasonable time may amount to a seizure under the Fourth Amendment. *See, e.g., Florida v. Royer*, 460 U.S. 491, 501-07 (1983) (retainment of airplane ticket and driver's license contributed to seizure). When law enforcement retains identification beyond a reasonable time for review, a detainee would likely not feel free to leave without it, and retaining identification suggests coercion. *United States v. Cavitt*, 550 F.3d 430, 439 (5th Cir. 2008). While Ms. Guidry did not have immediate access to her purse when she drove to her home, she obviously had the keys to her vehicle and possession of her identification in her purse during the drive. The fact that the officers followed Ms. Guidry to her home by car does not alter the fact that Ms. Guidry exercised freedom of movement. Allowing officers to follow as one drives one's own car does

not restrict one's movement by a show of authority. *Cf. Michigan v. Chesternut*, 486 U.S. 567, 574-75 (1988) (police driving beside pedestrian in marked cruiser did not amount to seizure). Thus, the Court finds that, when Ms. Guidry gave both oral and written consent to search the home, she was not in custody for purposes of the first of the six voluntariness factors, but instead, chose to cooperate in the presence of police.

As to the second factor, the police's tactics were not wholly coercive. Guidry argues that the officers threatened Ms. Guidry with arrest and the destruction of her property. However, this is an exaggerated misconstruction of the eight-minute recorded exchange between Ms. Guidry and police. Instead, the Court finds that the police officers never threatened Ms. Guidry with arrest nor made false promises of leniency to secure her cooperation. The Court finds credible the officers' testimony that they had no intention of arresting Ms. Guidry. This is supported by Marler's explicit statement that he "[could not] promise" she would not be arrested, the sincerity of Smith's tone in the audio recording in relating to Ms. Guidry that she was not the subject of their investigation, and his subsequent testimony to that effect at the hearing. Further, at no point in the encounter did either the officers or Ms. Guidry raise their voices; instead, the exchanges were cordial and cooperative, indicating a lack of coercion. *United States v. Blevins*, 755 F.3d 312, 326 (5th Cir. 2014).

In like fashion, the Court finds that the officers not only never threatened to destroy Ms. Guidry's property or to shoot her dogs, but took pains to reassure her that they would not do so. Both the officers' words and their tone evince reassurance about these matters, as opposed to threats of harm. Moreover, informing a person of the consequences of refusing consent is not a threat if such consequences are merely the legal ramifications of a person's actions. *See United States v. Roberts*, 86 F. Supp. 2d 678, 687-88 (S.D. Tex. 2000). Agent Smith testified that

obtaining consent to search was the smoothest way to proceed, avoiding any risk of harm to Ms. Guidry's property or her dogs if the police were required to enter the property with a search warrant. Agent Smith testified he had probable cause to obtain a search warrant for firearms in the home, indicating that, in his twenty-four years of police experience, "sovereign citizens" typically stockpile weapons to prepare for doomsday survival; upon arrest earlier that day, Guidry professed himself to be a sovereign citizen; prior investigation indicated that community members had said that Guidry had bragged about owning firearms; and officers had surveilled the home and observed it to be fortified with a fenced perimeter, several dogs, and unusual storm shutters. Taken together, these facts could amount to "a fair probability" that weapons would be found in the home. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Given that probable cause to obtain a search warrant existed, the officers could have broken down the door and shot the dogs in executing the search if necessary to gain access or protect those involved. Thus, the supposed threats to Ms. Guidry's property or dogs did not constitute duress or coercion because such actions would be legal courses of action if required to execute a search safely.

Guidry asserts that the officers forced Ms. Guidry to cooperate by suggesting that her child would be left unsupported. This too is an exaggeration of the officers' words. While it is true that, in some extreme circumstances, preying against a person's paternal instincts could overbear a person's will, the defendant has articulated no such circumstances here. *Compare Lynumn v. Illinois*, 372 U.S. 528, 531-34 (1963) (coercion where officers promised leniency from a ten-year sentence to a single mother of two infants who had "no previous experience with the criminal law"), *and United States v. Tingle*, 658 F.2d 1332, 1335-36 (9th Cir. 1981) (coercion where officers alluded to leniency from maximum penalties totaling forty years to a mother of two-year-old), *with United States v. Casby*, 2013 WL 3007166, at *15 (E.D. La. June 14, 2013) (no coercion

11

where officers implied child had "already lost one parent" and "wouldn't lose another one" if person confessed, distinguishing extreme circumstances in *Lynumn* and *Tingle*). At one point during the exchange, Marler told Ms. Guidry that "we don't want to involve you because you still got work. … And you have a child to take care of." This is the full extent of the reference to Ms. Guidry's daughter. In context, the Court finds that the words were intended to reassure, not threaten or intimidate. Again, this conclusion is reinforced by the tone in which they were conveyed. Moreover, unlike the defendant in *Lynumn*, Ms. Guidry had at least some experience with the criminal justice system as a convicted felon, so had some ability to evaluate the officer's words. But even if Marler's remarks were less benign, they, like the comments at issue in *Casby*, did not rise to the level of coercion.

Guidry makes much of the government's alleged misrepresentation that Guidry confessed to "everything." "Any misrepresentation by the government is a factor to be considered in evaluating the circumstances." *Davis*, 749 F.2d at 294. "Consent induced by an officer's misrepresentation is ineffective." *Cavitt*, 550 F.3d at 439. "The mere failure of the officers to give an encyclopedic catalogue of everything they might be interested in does not alone render the consent to search involuntary. The dispositive question is whether 'the government agent was found to have intentionally deceived the defendant by making false representations in order to induce consent.'" *United States v. Avila-Hernandez*, 672 F. App'x 378, 382 (5th Cir. 2016) (citation omitted) (quoting *Davis*, 749 F.2d at 297). In his testimony at the hearing, Smith admitted that Marler lied to Ms. Guidry when Marler stated, "We talked to him and we know what's in there. … Prepping, he told us everything."[31]

---

[31] Defendant Ex. D-1 A at 4-5.

On this record, the Court cannot say that the supposed fabrication played no part in Ms. Guidry's consent. Yet, the totality of the circumstances, on the record as a whole, does not indicate that Ms. Guidry's consent was induced, or that her will was overborne, by this ambiguous misrepresentation. *See, e.g.*, *United States v. Andrews*, 746 F.2d 247, 248, 250 (5th Cir. 1984) (finding valid consent despite police officer's misrepresentation of purpose to arrest defendant for illegal possession of a firearm when defendant "showed no hesitancy in answering police questions or in otherwise cooperating with the police" and "was not even under arrest and, indeed, had an hour in his own vehicle to reconsider his consent") (abrogated on other grounds); *United States v. Grobstein*, 2016 WL 10587954, at *24 (D.N.M. Mar. 7, 2016) (finding valid consent where DEA officer misrepresented himself as a police officer who made "repeated requests for consent to search" through the "vague and ambiguous description of his purpose as 'security'"). Marler's use of the term "everything" is vague and ambiguous. Guidry had told the officers about his political and religious beliefs, which included "prepping." But he had not told them about any firearms. Did Marler's reference to "what's in there" mean to include the firearms or something other than firearms, like the dogs, the provisions, or the security features of the home? Presumably, in agreeing at the hearing with defense counsel that Marler's statement was a lie, Smith believed the reference to encompass firearms. But a single vague reference, even if a lie, is not determinative of the voluntariness calculus. "Particularly because physical coercion by police is only one factor to be considered in the totality of the circumstances, we should approach psychological coercion the same way." *United States v. Spivey*, 861 F.3d 1207, 1214 (11th Cir. 2017) (citation omitted) (deception by law enforcement as to identity of officer and nature of investigation did not render a suspect's consent to search a home involuntary because it was relatively minor, creating little, if any, coercion). Importantly, the officers here did not brandish

13

their weapons, use handcuffs, or make threats to use violence or force, which shows an absence of coercive police procedures. *United States v. Tompkins*, 130 F.3d 117, 122 (5th Cir. 1997); *United States v. Smith*, 2010 WL 3835229, at *18 (S.D. Fla. Sept. 17, 2010). Nor did the officers conceal the nature of their criminal investigation; rather, they honestly informed Ms. Guidry that her husband had been arrested on a weapons charge. Thus, the misrepresentation of Guidry's confession, such that it was, is the only tactic that can be characterized as coercive to any degree. Overall, then, the encounter was untainted by coercion.

As to the third factor, Ms. Guidry's cooperation was extensive. At her place of employment, Ms. Guidry answered the officers' questions in a civil tone, made plans to leave work for the day to accompany the officers in the search, and permitted the officers to use the restroom. She drove her car approximately twenty minutes from work to her home. At the home, she signed a consent-to-search form. Guidry's argument that Ms. Guidry never gave written consent prior to the search is without merit. Officer Holley's recollection that Ms. Guidry signed the consent form prior to the search is more reliable than Ms. Guidry's recollection, given that Holley recorded the time he administered the form and the time that the search began, and that Holley was in a less stressful situation than Ms. Guidry. Moreover, Ms. Guidry demonstrated her continued implied consent by opening the gate, securing the dogs, and showing the police the location of the guns. Holley testified that her demeanor was cordial and helpful. When the search commenced, Ms. Guidry led officers straight to the bedroom, moving the mattress to uncover the gun so quickly that the officers had to instruct her not to touch the gun. And she described and showed the officers the location of at least some of the other guns that were seized. This factor weighs significantly in favor of voluntariness.

Fourth, even if true, that the officers failed to inform Ms. Guidry of her right to refuse consent is not dispositive of the constitutionality of the search; rather, the failure to inform a person of one's rights is but one factor to be considered in evaluating voluntariness. *Schneckloth*, 412 U.S. at 227. Here, the officers did not inform Ms. Guidry of her right to refuse consent at the time she gave oral consent, in line with what Agent Smith testified as their standard operating procedure. Nevertheless, Ms. Guidry was a convicted felon who was not unfamiliar with the criminal justice system, *see United States v. Galberth*, 846 F.2d 983, 987-88 (5th Cir. 1988) (any weight given to officer's failure to inform felon of her right to withhold consent offset by prior experience with constitutional rights in a criminal setting), though Ms. Guidry testified that her prior conviction and experience did not provide her with a complete understanding of her rights. However, Ms. Guidry did sign the consent-to-search form before the search began, and that form specifically recites that "I have been informed by the above named officer [Holley] that I may refuse to consent to any search and that I may revoke my consent to search at any time."[32] Holley also testified he informed Ms. Guidry of her right to withdraw consent at any time. On balance, this factor weighs somewhat in favor of voluntariness as to the oral consent but certainly as to the written consent.

As to the fifth factor, the government contends that no evidence exists to suggest that Ms. Guidry was uneducated or unable to read or understand English. Ms. Guidry testified that she had an eleventh-grade education and received her GED. She is employed in a security business. In her testimony, Ms. Guidry displayed no difficulty in understanding and responding intelligently to the questions of counsel. This factor weighs in favor of voluntariness.

---

[32] Gov't Ex. D. at Guidry00091.

Sixth, and finally with respect to the test for the voluntariness of her consent to search, Ms. Guidry was indeed aware that incriminating evidence would be found in the home. Knowledge that contraband will be found pursuant to a search tends to show that consent is involuntary. *See United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997) (lack of evidence to support the defendant's wife's belief that incriminating evidence would be discovered weighed in favor of voluntariness). However, weighing this factor in favor of involuntariness is not dispositive. *United States v. Arias-Robles*, 477 F.3d 245, 249-50 (5th Cir. 2007); *Solis*, 299 F.3d at 437 (affirming holding that defendant's wife voluntarily consented where she "was aware that incriminating evidence was at the house because she pointed heroin out herself").

In sum, the totality of the circumstances does not establish that Ms. Guidry's will was overborne in consenting to the search of her home. While the officers may have misrepresented the nature of Guidry's confession, the rest of their statements were truthful and reassuring. Importantly, the fact that Ms. Guidry departed work and drove in her own car for twenty minutes to her home demonstrates a high level of cooperation and evinces an act of free will, for she had reasonable opportunity to change her mind. Once at the home, Officer Holley again asked Ms. Guidry for consent to search before any officers entered the home, and Ms. Guidry freely provided written consent. Ms. Guidry cooperated further by identifying the location of certain guns in the home. Furthermore, although tangential to the consent on March 2, 2018, Ms. Guidry's second, unchallenged consent to search the home on March 7, 2018, tends to confirm that her initial consent was freely given. Thus, the totality of the circumstances indicates that Ms. Guidry voluntarily consented to the search.

## IV. CONCLUSION

For the foregoing reasons, because the Court finds that Ms. Guidry's consent to search the Guidry home was valid, authorized, and voluntary,

**IT IS ORDERED** that Guidry's Motion to Suppress (R. Doc. 15) is DENIED.

New Orleans, Louisiana, this 21st day of December, 2018.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE